■ L&L PAINTING CO., INC., et al., Appellants, v CONTRACT DISPUTE RESOLUTION BOARD OF THE CITY OF NEW YORK et al., Respondents. [892 NYS2d 55]—

Following competitive bidding, DOT awarded petitioner L&L a public works contract for removal of lead-based paint from the Queensboro Bridge. The contract requires L&L to construct a protective scaffolding platform above the bridge's roadways. The instant dispute stems from the parties' conflicting interpretations of a contract drawing on a document identified as "sheet 26R," which consists of two drawings and a column of explanatory notes. The drawing of the main bridge typical cross section depicts the north and south "outer," "inner" and "upper" roadways of the bridge. Note 5 reads: "Minimum vertical clearance of 14 feet shall be maintained above all roadways." The only references to note 5 in the cross section drawing consist of two lines showing clearance on the south inner and upper roadways. However, the outer roadway is approximately 18 inches higher than the inner roadway. Nevertheless, the cross section drawing depicts the protective platform as a straight horizontal plane notwithstanding the difference in elevation. Based on the elevation differential, L&L's platform subcontractor, petitioner Odyssey, submitted to DOT a proposed shop drawing placing the protective platform at 10 feet, 6 inches, instead of 14 feet, above the outer roadway surface. DOT's engineering consultant rejected the shop drawing and directed Odyssey to amend it to conform to the 14-foot vertical clearance requirements set forth under note 5. This amendment required L&L to incur what it claims to be additional costs stemming from the necessary relocation of existing power cables, among other things.

Based upon the foregoing, L&L filed requests for the payment of its purported additional costs with DOT and the Comptroller of the City of New York. Upon the denial of its requests, L&L petitioned CDRB for a review, pointing out as follows: "[T]he elevation of the inner roadway and the outer roadway are significantly different. If the elevation of the platform is maintained and the elevation of the roadway is different, it is

impossible to maintain the same clearance. This is an ambiguity in the contract documents." At oral argument, L&L urged CDRB to construe the ambiguity against DOT, the drafter of the contract. With one dissent, the CDRB panel denied L&L's petition on the ground that even though the drawing on sheet 26R was ambiguous, L&L failed in its responsibility to request clarification of the ambiguity prior to bidding. In this regard, paragraph 7 (A) of the prebid information package required bidders to examine the contract documents and make written requests for "an interpretation or correction of every patent ambiguity, inconsistency or error therein which should have been discovered by a reasonably prudent bidder."

The instant CPLR article 78 proceeding is brought on the ground that CDRB's determination was arbitrary and capricious. Petitioners allege that CDRB's decision disregarded the contract documents by requiring petitioners to discover and seek clarification of a latent ambiguity. Supreme Court dismissed the petition, finding the ambiguity on sheet 26R to be patent. We affirm for the following reasons.

Note 5, which textually requires the 14-foot vertical clearance above *all* roadways, is referenced in the drawing only with respect to the south inner and upper roadways. The issue that divides the parties could have been obviated if the clearance requirement had been limited to "these roadways," "this roadway" or even "roadway," instead of "all roadways." Accordingly, there is a rational basis for CDRB's determination that the drawing on sheet 26R is ambiguous. Because the record contains no expert opinion on the subject, we find no basis for our dissenting colleague's conclusion that "there appears to be no engineering ambiguity in the plan attendant to the contract." The dissent also posits that an engineer, the intended reader of the contract, would reasonably conclude that the minimum 14-foot clearance is not required on the outer roadway. As noted above, DOT's engineering consultant rejected this contention in a letter from a professional engineer, stating that note 5 is general and applies to all roadways. As the record contains no evidence of a contrary engineering opinion, we cannot presume that any other engineer would have reached a different conclusion.

According to Black's Law Dictionary, a patent ambiguity is one that appears on the face of a document and arises from the language itself. A latent ambiguity does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed (*see id.*). The ambiguity here is patent because its source is note 5's

textual reference to "all roadways," in contrast to the apparent indication on the drawing that note 5 applies only to the south inner and upper roadways. Concur—Friedman, J.P., Sweeny and DeGrasse, JJ.

Nardelli and Catterson, JJ., dissent in a memorandum by Catterson, J., as follows: The disputed notations of the contract scale plan drawing in question are unambiguous in the eyes of its intended reader, an engineer. Furthermore, the use of a scale rule when viewing those scale plan drawings establishes that they are unambiguous and that petitioners correctly interpreted them. Hence, I believe the agency's decision was arbitrary and capricious, and should be annulled.

This action arises out of a CPLR article 78 petition in which petitioners seek to annul a determination by New York City's Contract Dispute Resolution Board (hereinafter referred to as CDRB) that the contract at issue was ambiguous, that under the terms of the contract the ambiguity was required to be resolved prior to bidding, and thus petitioners were not entitled to compensation for extra work. Subsequently, the Supreme Court confirmed the determination holding that CDRB's decision had a rational basis.

The contract at issue is for the removal of lead paint from the Queensboro (59th Street) Bridge. As part of the paint removal project, respondent Department of Transportation (hereinafter referred to as DOT) required that petitioner L&L install a protective shielding platform above the roadways to protect vehicles and pedestrians on the bridge from falling debris, and to protect workers at the elevated level.

The record reflects that the bridge has 10 lanes divided among three major sections: the upper roadways, the lower inner roadway, and the lower outer roadway. At issue in this case are the notations for the lower level where the two outer roadways run on the north and south side of the bridge (the north side having limited access solely to pedestrians and bicycles while the south side is limited to passenger cars), and where the inner roadway consists of four lanes. It is undisputed that the outer roadways sit at a higher elevation, at approximately one foot, five inches higher than the inner roadway.

On September 18, 2003, L&L was awarded the contract by DOT, and on March 3, 2004, subcontracted petitioner Odyssey to install the platform, designed by DOT's project engineer, Parsons Transportation Group. Prior to its bid in February 2004, Odyssey took measurements of the bridge to confirm the specifications of Parsons's design drawing No. P-18R, sheet 26R, which is a plan drawn to scale showing a "typical cross section"

of the bridge and a "typical tower elevation" (hereinafter referred to as the plan). Odyssey discovered in its measurements that the maximum clearance for the outer roadways was 12 feet, 8 inches due to the higher elevation combined with the placing of the bridge towers, utility lines, and light fixtures. After Odyssey took field measurements and adjusted their designs to account for the outer roadway's actual maximum clearance, Parsons approved the design.

In the plan, the platform is marked as a horizontal line that runs above the north outer roadway and continues over the four lanes of the inner roadway and across the top of the south outer roadway. The platform, as drawn, is flat and level all the way across the two outer roadways and inner roadway. Notably, the platform as drawn does not compensate for the height differential between the north outer roadway and the inner roadway or between the south outer roadway and the inner roadway. Therefore, the plan as drawn indicates that the height clearance of the platform over the inner roadways is greater than the height clearance of the platform over the two outer roadways, the difference being the change in elevation between inner and outer roadways. It is uncontroverted that the plan is drawn to scale.

It is also notable that only the four lanes of the inner roadway are designated on the plan by a reference to note 5 on a vertical line drawn between the roadway and the platform. On the right-hand side of the plan are the listings of the notations associated with the engineer's design. Specifically, note 5 states, "Minimum vertical clearance of 14 feet shall be maintained above all roadways." Correspondingly, only the south outer roadway is designated by a reference to note 7, which states, "All protective shielding platforms and containments shall be installed in accordance with approved shop drawings to the satisfaction of the contractor's engineer." The north outer roadway is designated by a reference to note 4, which states that "During construction, the entire width of bikeway/walkway on the north outer roadway shall not be reduced or obstructed at any time."

The record reflects that Odyssey deduced these notations meant all roadways designated with note 5 (i.e. inner roadways) would have a minimum vertical clearance of 14 feet under the platform. Likewise, Odyssey interpreted note 7 to mean the platform was to be installed above the south outer roadway in accordance with shop drawings showing there would be less than a 14-foot clearance along the outer roadways.

However, following approval by Parsons and the award of the contract to L&L, DOT directed L&L to redo the design with at

least 14 feet of clearance between the platform and the outer roadways. L&L requested more funding for the additional work required to construct the platform 14 feet above the outer roadways, due to the hindrances of the light posts and the necessary relocation of electrical cables. DOT refused to pay for the additional work, at which point the dispute came before CDRB.

On July 27, 2006, CDRB held, by a vote of two to one, that DOT's plans created confusion between the notations and the actual plan, resulting in an ambiguity according to the contract. CDRB thus held that L&L should have sought clarification on the ambiguity in the prebidding meeting. Thus, CDRB held the contractor was not entitled to additional compensation. Furthermore, CDRB found that Parsons had the ability to approve certain parts of the project but ultimately left approval up to the City. However, the sole dissent, coming from the only engineer on the panel, concluded that "from a construction/ engineering point of view, [the conclusion] reached by L&L [for the platform's placement] was reasonable."

On January 22, 2008, the court below denied the petition to set aside CDRB's determination on the grounds that the decision was not arbitrary or capricious. The court found it rational for CDRB to find ambiguity between note 5 and the plan because note 5 said "all roadways" but did not make clear whether it was all lanes of the inner roadway or all the lanes including the outer roadways. Finally, the court noted that where a clause for prebid clarification of ambiguities exists in a contract, contractors are subject to the City's interpretation if they fail to adhere to it.

The court erred in finding a rational basis for CDRB's decision. It ignored the opinion of the sole engineer on the board, and so the context of both the designs and the notations was not properly considered from the appropriate viewpoint of the intended readers, i.e., engineers rather than lawyers.

It would be apparent to an engineer that note 5 cannot be read independently of the plan, which clearly and specifically places note 5 on the inner roadway and not on the outer roadways. DOT argues, and the court agreed that the discrepancy between the language in note 5 with regard to the outer roadways and the plan is a rational basis for a finding of ambiguity. However, the only means by which the intended reader can initially apply note 5 to outer roadways is to purposely read note 5 standing alone and outside the context of the plan.

Likewise, it is also apparent that the plan is drawn to scale. In other words, the intended reader, the engineer, could measure the designated height of the platform for the inner roadway

as it compares to the designated height of the platform for the outer roadway. In doing so, the intended reader would reasonably conclude that the 14 feet is not required for the outer roadway due to that roadway's elevation differential and the unadjusted level line on the drawing representing the platform.

The plan cannot be properly viewed in the same way as an accountant's worksheet or lawyer's brief, but rather must be read as an engineer and others in the field of construction would read it. Indeed, the only engineer on the CDRB panel read it to mean something entirely different from the interpretation of the others on the panel.

Since, in my opinion, this is an engineer's problem and there appears to be no engineering ambiguity in the plan attendant to the contract, the clause for prebid clarification on ambiguities does not apply. Moreover, it is apparent that a 14-foot requirement applied to the outer roadways would substantially increase the work required of L&L and Odyssey. There is no evidence in the contract of DOT's intent to require such extra work as relocating electrical cables. Moreover, DOT could not have reasonably expected L&L and Odyssey to complete more than the estimated $1 million worth of extra work without compensation.

Furthermore, DOT's argument for the 14-foot requirement over the outer roadway as a safety measure is not persuasive, but rather arbitrary and unreasonable. For example, the posted height clearance for travel on the south outer roadway is only eight feet, five inches, and there are a number of fixtures on the bridge that are already situated below the 14-foot requirement, such as light posts, utility lines, and a portion of the bridge's towers.

Consequently, there was no rational basis for the board's finding of ambiguity in the drawing and notations, and so the determination should be annulled.